# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs December 7, 2010

## STATE OF TENNESSEE v. ANTHONY DODSON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 08-01015      W. Otis Higgs, Jr., Judge**

**No. W2009-02568-CCA-R3-CD  - Filed June 2, 2011**

The defendant, Anthony Dodson, was convicted of attempted first degree murder, a Class A felony, and sentenced to twenty-five years as a Range I, standard offender. The defendant now appeals, claiming insufficient evidence to support his conviction and that the sentence imposed by the trial judge was excessive. After reviewing the record, we find error in neither the defendant's conviction nor his sentence, and we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

Robert Wilson Jones, District Public Defender, and Phyllis Aluko and Robert Felkner, Assistant Public Defenders, for the appellant, Anthony Dodson.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; William L. Gibbons, District Attorney General; and Nicole Germain and Summer Morgan, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The defendant in this case challenges his conviction of attempted first degree murder. At trial, the victim and the defendant gave two vastly different accounts of the events that transpired during the early morning hours of December 28, 2007. According to the victim's testimony, she and the defendant had been boyfriend and girlfriend for approximately eight months and had been living together in her mother's home for some time. On the night in question, she left her job at Federal Express at around three a.m. Thereafter, she attempted to reach the defendant on his cell phone numerous times. The defendant would either hang

up on her or not answer the phone. When the victim arrived at her home, the defendant's car was not there. The victim then became angry at the defendant's suspicious behavior and made the decision to throw him out of her house.

After a period of time, the victim finally reached the defendant by phone. He gave several different explanations for his whereabouts, but the victim drove around checking out each of these explanations and found none of them to be credible. She returned to her home, and the defendant eventually returned home as well, urging reconciliation and making various excuses for his behavior. The victim, however, refused to be appeased and responded with a tirade directed at the defendant that culminated with the victim ordering the defendant to leave her home. In response, the defendant cursed at her but stated that he was going to vacate the premises. However, while continuing to proclaim his intention to immediately leave, he, instead, reached under the bed they shared, grabbed a .38 caliber revolver handgun and a box of bullets belonging to the victim, and proceeded to load the weapon. After briefly grabbing at his arm, the victim turned and fled in a vain attempt to reach her panic button before the defendant shot her. The victim was knocked to the ground by what she presumed was a bullet, and she drifted in and out of consciousness. After some time, she attempted to get herself up, knocking over a silk tree in the process. The victim found herself unable to see but eventually kicked out the glass and screen of a window, causing a gash in her leg. Once the victim made it outdoors, she rested for a time on the ground in the pouring rain and screamed for help. She eventually heard a "Caucasian"-sounding man's voice ask her, "who did this to you?" The victim replied that her boyfriend, the defendant, had shot her. After that, she lost consciousness and later awoke in a hospital.

The defendant testified to a very different version of events when he took the stand in his own defense. He started by explaining his criminal history, which included convictions for aggravated robbery and kidnaping, as well as a misdemeanor handgun violation. After explaining these offenses, the defendant related that he became involved with the victim after meeting her through a chat line during April of 2006, despite his being married at the time. Although the victim initially told him that she had never been married, he later found out that she had been and was still married to someone else. Nonetheless, things progressed in their relationship to the point that the defendant decided to move in with her in November of 2006. At some point, the defendant discovered that the victim was "bisexual" and was "very promiscuous with women," which apparently caused him some concern. His suspicions only grew sometime later when he discovered the victim engaging in chat line activities on her computer, even though he had apparently believed that she had ceased all such activities.

Later, on an unspecified night, the victim's cell phone issued an audible buzzing, and the defendant was able to reach the phone before the victim. He discovered an incriminating text message on the phone, which appeared to confirm that the victim was engaging in an

affair with a female coworker. This fact, combined with some other suspicious behavior on the part of the victim involving an unusual amount of time she was taking off from work, led the defendant to check up on the victim on the night of December 27, 2007. On that particular evening, while coming home from his work, he visually determined that the victim's car was not located where he thought it ought to be parked. The defendant went to her house and later left, driving aimlessly around. At approximately three a.m., the victim called the defendant and insisted that she was at work, but when the defendant tried to call her back, neither she nor any other Federal Express employee would answer the phone. The victim called the defendant again and insisted that the defendant was "not calling." The defendant responded by accusing her of cheating, stating his intention to leave, and threatening to inform the victim's mother that she was a lesbian.

When the defendant returned to the victim's house to collect his personal possessions, the two got into an argument concerning the defendant's alleged jealousy and whether or not the defendant was going to tell the victim's mother about her sexual activities. The defendant testified that he went to the closet to get his clothes. When he came back, the victim had dumped out her handbag, and the defendant noticed that she now held a gun in her hand. The defendant inquired of the victim why she was "playing with that gun" and unleashed a torrent of aspersions toward her, deriding her for her alleged promiscuity and sexual orientation. The victim then fired a single bullet at him, which missed and passed through the window behind him. According to the defendant, he then lunged at the victim and grabbed her hand. The two commenced wrestling, and, during the struggle, the gun went off twice. The victim collapsed. The defendant explained that he panicked after the gun went off and that all his thoughts turned to fleeing the scene. Unable to locate his own keys, he grabbed those belonging to the victim and drove from the house in the victim's vehicle. Before he left, however, he was able to determine that the victim was still alive because she was "snoring."

The defendant then called his own wife, from whom he had been previously separated, and related what had transpired. Although his wife advised him to turn himself over to the proper authorities, the defendant told his wife that the victim had merely suffered a grazing bullet wound and would be all right. Instead, the defendant decided to move to Louisiana and start working at a new job. He told his wife that after he saved up enough money for a lawyer, he would return back to Tennessee to face the consequences. The defendant testified that he worked in Louisiana for five months before he was arrested and brought back to Shelby County.

Regardless of the precise circumstances surrounding the shooting, on February 14, 2008, the defendant was indicted by the Shelby County Grand Jury on two counts: attempted first degree murder and theft of property valued at more than $1000, but less than $10,000.

On May 18, 2009, the second count of the defendant's indictment was dismissed for want of prosecution. The defendant was tried on the remaining charge from May 18-21, 2009.

In addition to the testimony of the victim, the State presented the testimony of Lieutenant James Grigsby of the Memphis Police Department, who responded to the call to the victim's residence on the night of the crime. Officer Grigsby testified that when he arrived, he heard a woman yelling for help from her backyard. He further testified that when he found the woman she was conscious, soaking wet, and visibly injured. The woman claimed that she was unable to see. A window leading to the victim's residence was open nearby, and a window screen was lying outside it on the ground as though someone had recently gone through it. Officer Grigsby directed other responding officers to enter the victim's house through that open window because all the doors to the house were found to be locked. After determining that the house was empty, he and the other officers moved the victim back into the house to get her out of the inclement weather. Once inside the house, Officer Grigsby observed that the victim's bedroom was in disarray and that there was blood on the carpet and in the bathroom. He further testified that there was a gun case and a box of bullets lying on the bed. He also observed a bullet hole through one of the bedroom windows.

Officer Grigsby called for an ambulance and asked the injured woman what had transpired. The woman informed him that she and her live-in boyfriend had argued after he had been out all night, and she had started throwing all of his clothes by the front door in the course of ending the relationship. She further stated that the argument had turned physical and that, ultimately, he had shot her in the head.

Thereafter, the State presented the testimony of Officer Lavern Jones, a crime scene investigator with the Memphis Police Department. Officer Jones processed the crime scene on the night in question and authenticated several photographs she had taken of the location. From the photographs, she identified a box of live rounds and loose bullets that were discovered on the bed. She also testified that despite searching, she failed to recover any spent bullets or shell casings from the crime scene. Before concluding, Officer Jones identified a bullet hole in the victim's master bedroom window, various bloodstains, and an overturned plant from her crime scene photographs.

Finally, the State presented the testimony of Dr. Thomas Oliver, a doctor of neurosurgery, who was the victim's treating physician at the Regional Medical Center at Memphis (MED) on the night in question. He testified that he performed emergency procedures on the victim and dictated an operative report concerning her injury. Dr. Oliver testified that he performed a CAT scan on the victim and explained the results of that CAT scan to the jury. From his visual examination of the victim and the results of the CAT scan,

Dr. Oliver determined that the victim had an entry wound to the back of her head and a portion of a bullet (as well as accompanying metal fragments) lodged in her brain. He testified that he operated on the victim to repair the entry hole, wash out the victim's brain, and remove numerous bits of metal fragment. He testified, however, that he had to leave the largest portion of the bullet in place in the victim's brain because any attempt to remove it could have caused additional brain damage. He testified that the victim would likely experience permanent impairment to her vision owing to the damage caused to her optic nerves by the injury.

Dr. Oliver further testified that the victim appeared to have a second, "grazing" wound to the other side of her head, which he closed with staples. He explained that he recovered no bullets from this area because whatever had caused the injury had not fully entered the body. Dr. Oliver testified that in order to inflict these injuries, a shooter would have had to have been located behind the victim's head. Dr. Oliver further testified that he saw no powder burns or anything of that nature on the victim's hair before he shaved it off in order to perform the operation. After presenting this testimony, the State rested.

The defendant took the stand in his own defense and testified as described above. The defense presented no other evidence. On May 21, 2009, the defendant was found guilty of attempted first degree murder. On September 29, 2009, the defendant was sentenced to twenty-five years as a Range I, standard offender. A motion for new trial was filed that same day and was denied by the trial court on November 30, 2009. This appeal promptly followed.

I.

The defendant's first claim is that the evidence is insufficient to support his conviction for attempted first degree murder. "When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *see also* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Great weight is given to the result reached by the jury in a criminal trial; matters such as the credibility of witnesses, the weight given their testimony, and the proper resolution of any conflicts in the evidence are ordinarily left in their care. *Dorantes*, 331 S.W.3d at 379. Consequently, "on appeal, the State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *Id.* (internal quotation omitted). In essence, a jury's verdict of guilt strips the defendant of the presumption of innocence and replaces it with a presumption of guilt that the defendant must strive to overcome on appeal. *Id.*

In the case at bar, the defendant was convicted of attempted first degree murder. "A

-5-

person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." T.C.A. § 39-12-101 (2011). "First degree murder is . . . [a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). "Premeditation" means the formation of an "intent to kill," done: (1) "prior to the act itself" (but not necessarily held "for any definite period of time" prior to the act), (2) "after the exercise of reflection and judgment," and (3) while "sufficiently free from excitement and passion." T.C.A. § 39-13-202(d).

The defendant argues that the State failed to present sufficient facts to support the jury's finding of premeditation. The presence or absence of premeditation, like other forms of intent, is a question of fact for a jury to determine, and it may be proven by either direct or circumstantial evidence. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). Circumstantial evidence from which a jury may infer premeditation includes any evidence of: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing," *id.* at 659, as well as any evidence of the "destruction or secretion of evidence of the killing," the "establishment of a motive," "the use of multiple weapons in succession," or the use of "repeated blows" to accomplish the killing, *State v. Leach*, 148 S.W.3d 42, 53-54 (Tenn. 2004). These various circumstantial factors that may give rise to an inference of premeditation are collectively known as the *Bland* and *Leach* factors. These factors are not exhaustive; "[p]remeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done 'after the exercise of reflection and judgment.'" *Leach*, 148 S.W.3d at 53 (quoting T.C.A. § 39-13-202(d)). Nor is any individual *Bland* or *Leach* factor necessarily completely dispositive of the premeditation inquiry–to the contrary, many individual factors will only support a jury finding of premeditation if they are found in conjunction with other factors or evidence. *See, e.g.*, *State v. Brown*, 836 S.W.2d 530, 542-43 (Tenn. 1992) (evidence of the infliction of "repeated blows" held insufficient, standing alone, to support a jury finding of premeditation); *Meazel v. State*, 500 S.W.2d 627, 629 (Tenn. Crim. App. 1973) ("[W]illful killing with a deadly weapon [alone] is not a sufficient basis for an inference of premeditation and deliberation.").

In the present case, however, there was ample evidence from which a jury could infer that the defendant premeditated this attempted killing. Although there were significant discrepancies between the testimony of the victim and the defendant, for purposes of analyzing a sufficiency of the evidence claim, we must accept whichever version of events most favors the State. *Dorantes*, 331 S.W.3d at 379. According to the victim's version of events, the shooting satisfied two *Bland* factors – the use of a deadly weapon against an unarmed victim, and the procurement of a deadly weapon (taken from underneath the

victim's bed). In addition, the defendant satisfied three *Leach* factors – the infliction of multiple wounds (two gunshots to the back of the head), the secretion of evidence of the killing (by removing the gun and spent shell casings from the crime scene), and the establishment of a motive (his desire for revenge and animosity stemming from the victim's decision to break up with him).

Although these factors would be more than enough to support the jury's premeditation finding, these factors are bolstered in this case by considerable additional circumstantial evidence. According to the victim's testimony, the revolver used by the defendant was initially unloaded, and the defendant was forced to open and dump out a box of bullets, load the gun, and close the cylinder before he could fire, giving him considerable time to contemplate the nature of his actions before he shot. Moreover, while loading the weapon, the defendant continued to make oral statements to the effect that he was going to leave, thus confusing the victim and perhaps even delaying her attempt at flight for a few crucial seconds. The defendant's rapid ability to craft such an adroit technique to facilitate his effort to shoot the victim gives rise to a strong inference that killing this victim was precisely his intent. Finally, although by his own admission he believed her to still be alive after the shooting, the defendant left the victim alone without ever attempting to render her any kind of aid or summon any assistance for her. To the contrary, responding officers arrived only to discover that all of the doors to the victim's house were locked – meaning that this defendant took active steps to prevent or delay potentially life-saving aid from reaching the victim by locking the doors to her house before leaving the crime scene. His act of barring her doors against potentially life-saving aid provides strong circumstantial evidence that this defendant formulated an intent to cause her death prior to fleeing the crime scene.

The defendant seeks to avoid this result by arguing that his version of the events that culminated in the shooting better match the physical evidence than the version of events presented by the victim. Of crucial importance to the defendant's argument is the presence of the bullet hole in the victim's master bedroom window. The victim's testimony does not seem to account for the angle and trajectory of this bullet. It does, however, match the defendant's version of events in which the victim shot at him first and then he accidentally shot her twice during a struggle over the gun. The defendant combines this discrepancy with less serious inconsistencies in the victim's statement in order to claim that the "credible facts" presented to the jury neither establish premeditation nor defeat the defendant's claim of justifiable self-defense. But as we have repeatedly stated, it is not for this court to re-weigh on appeal the credibility of the facts presented to the jury. *See, e.g.*, *Dorantes*, 331 S.W.3d at 379.

The jury in this case heard the testimony from both parties, reviewed the physical evidence, and unanimously resolved any and all discrepancies in that testimony and evidence

against the defendant. It does not matter, and this court need not determine, whether the jury rejected the defendant's argument concerning the incongruous bullet hole by concluding that the victim experienced a minor memory lapse due to the heat of the events, perhaps combined with her injury; whether they suspected that the defendant fired an additional shot after the victim lost consciousness in an effort to stage the crime scene to his benefit should he later be apprehended; whether they concluded that the victim did indeed shoot first but that, thereafter, the defendant tried to execute her once he gained control of the gun; or whether they resolved the discrepancies in some other fashion. Whatever the rationale, this jury ultimately arrived at the seemingly unstartling conclusion that the victim was not accidentally and unintentionally shot twice in the back of the head. Viewing the evidence in the light most favorable to the State, "[t]he jury had a rational basis for the verdict[] of guilt." *Id.* at 390.

## II.

The defendant also claims that the twenty-five-year sentence imposed by the trial court is excessive. "When a defendant challenges a sentence on appeal, he or she bears the burden of showing that the sentence is improper." *State v. Hester*, 324 S.W.3d 1, 70 (Tenn. 2010). The standard of review of a trial court's sentencing decision is *de novo*, with a presumption that the trial court's determinations are correct, so long as the trial court considered the proper sentencing principles and the relevant facts and circumstances. *Id.*; *State v. Carter*, 254 S.W.3d 335, 344-45 (Tenn. 2008). Since the Sentencing Act's revisions in 2005, the "weighing of various mitigating and enhancement factors has been left to the trial court's sound discretion," and appellate courts have been "left with [only] a narrow[] set of circumstances in which [we may] find that [the] trial court has abused its discretion in setting the length of a defendant's sentence." *Carter*, 254 S.W.3d at 345-46.

In this case, the defendant has not met his burden of demonstrating any sentencing error. The Sentencing Act requires a sentencing court to impose a sentence within the statutory range of punishment for the crime at issue, which is determined by the offender's class. *See* T.C.A. § 40-35-210(c). The trial court did so; the defendant concedes that the trial court correctly determined him to be a Range I, standard offender and that his sentence of twenty-five years is within the fifteen to twenty-five year range prescribed for those committing attempted first degree murder, a Class A felony. *See* T.C.A. § 40-35-112(a).

Instead, the defendant argues that the trial court (1) considered an inappropriate enhancement factor, (2) erroneously found one of three enhancement factors to exist, and (3) failed to consider two mitigating factors in setting his sentence. We disagree.

The defendant argues that the trial judge "improperly based his [sentencing] decision

on popular public opinion . . . suggest[ing] that if he did not give the defendant the maximum sentence, he'd be run out of town." The transcript of the sentencing hearing does reflect that the trial judge used a less than ideal turn-of-phrase – "I'd be run out of town" – during the course of an unusual digression occurring during his lengthy sentencing soliloquy. This colloquial expression was uttered during a discussion of a hypothetical situation involving his hypothetical decision to impose a sentence that would allow the defendant to walk out of the courtroom that day as a free man. Obviously, both this court and the citizens of Tennessee expect trial judges to sentence those who appear before them pursuant to the strictures of the Sentencing Act, without regard to personal consequences or shifting vagaries of public opinion.

However, reviewing the record as a whole, we do not believe that this judge considered public opinion as an enhancement factor or impermissibly sentenced the defendant based on personal consequences. Rather, the trial judge was trying to make a more general point to the defendant about the invisible harm inflicted on society by violent crimes such as the one he committed, explaining that "people are scared to death in this community" and that this fear has had a negative impact on the way community members travel, work, and carry on their daily lives. Because of this harm the community was suffering from violent crimes, the trial judge explained that he needed "to be concerned about the deterrent effect" when setting the defendant's sentence, a consideration that was plainly permissible for him to consider. *See* T.C.A. § 40-35-102(3).

Thus, although the trial judge let slip the phrase "I'd get run out of town," he did not mean it in its literal sense (*i.e.* as reflecting some actual concern over public opinion or the personal consequences he might suffer from following proper sentencing procedure). Rather, he meant it to express, as he explained immediately following, that "nobody would understand it and I certainly wouldn't understand it" if he did not give proper weight to the importance of deterrence in sentencing in light of the social harm caused by the defendant's violent crime. That the trial court's statement was not intended as literal is confirmed by the fact that the trial judge made it not in reference to giving the defendant the fifteen-year minimum sentence required for his crime, but to a hypothetical sentence of less than one year, which would have allowed the defendant to walk free from the courtroom that day. Reviewing the transcript as a whole, it is plain that the trial judge was not unduly swayed by public opinion at sentencing nor did he sentence the defendant out of fear for his career or personal safety. Rather, he merely used a colorful figure of speech to convey his belief that, as he later clarified, "this case cries out for the maximum punishment" because of the considerable harm the defendant did to society when he placed the community in a heightened state of fear by shooting the victim.

The defendant next claims that the trial judge erroneously applied an enhancing factor

to lengthen his sentence based on a false assumption that the defendant completely blinded the victim. The defendant points out that the victim in this case was not permanently blinded; "the proof at trial revealed that the victim had no bottom peripheral vision in her left eye, but her right eye was okay." Once again, while the trial judge did make statements such as "[t]his lady . . . has lost her eyesight" and "[s]he has lost her vision" at sentencing in reference to the victim's injuries, the defendant is reading these statements too literally in arguing that the trial judge decided to apply an enhancement factor based on erroneous facts. In making these statements, the judge was merely trying to drive home to the defendant the harm he had inflicted on the victim by shooting her. Although using descriptive words such as blinded, lost eyesight, and lost vision to describe the victim's condition, the trial judge never actually indicated that he held the incorrect belief that the victim had suffered total blindness or that her blindness was permanent.

To the contrary, the trial judge appears to have been well aware of the precise nature of the victim's injuries and to have appropriately found them to be worthy of consideration in setting the defendant's sentence. Indeed, immediately preceding these statements, the trial judge summarized a letter he had received from the victim, in which she explained, "I have suffered peripheral vision loss which makes driving out of the question." Moreover, the trial judge had the opportunity to observe the victim at length when she testified at trial, a fact which, combined with the detailed testimony he heard from the State's medical expert concerning the extent of the victim's injuries, renders it plain to us that the trial court did not sentence the defendant under the erroneous assumption that she had been completely and permanently blinded.

Finally, the defendant argues that the trial judge failed to consider and apply two mitigating factors – provocation on the part of the victim and the defendant's expression of remorse. At his initial sentencing hearing, the trial judge heard argument from the prosecution that the defendant deserved the maximum sentence due to the presence of three aggravating factors: the defendant's lengthy criminal record (in addition to those crimes necessary to establish his range), the fact that the damage inflicted on the victim was particularly great, and the fact that this offense was committed while the defendant was released on parole for another offense. The trial court also heard argument from the defendant that his sentence should be mitigated based on the fact that he acted under strong provocation (*viz.*, the victim's act of pulling a gun on him) and had made a statement of remorse (albeit one that primarily re-argued his innocence and blamed the victim for the shooting). The trial court took all of these arguments under advisement and, at the defendant's suggestion, delayed handing down a sentence while reviewing the issues. During the intervening month, he received and reviewed numerous letters written by the defendant requesting leniency on these and other grounds.

The trial court ultimately rejected the defendant's "plea for consideration." It is well established that even if "a trial court recognizes and enunciates several applicable mitigating factors, it does not abuse its discretion if it does not reduce the sentence from the maximum on the basis of those factors." *Carter,* 254 S.W.3d at 345. In this case, the trial court gave no indication whatsoever that any of the mitigating factors raised by the defendant and his counsel were even applicable. It is clear, however, that he carefully considered and rejected all of the pleas for leniency that had been urged upon him.

CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE